**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

| | |
|---|---|
| John Doe, *on behalf of himself and all others similarly situated*,<br><br>Plaintiff,<br><br>v.<br><br><br>GRADY MEMORIAL HOSPITAL CORPORATION<br><br>Defendant. | Case No. _____<br><br><br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

**CLASS ACTION COMPLAINT**

Plaintiff John Doe ("Plaintiff"),[1] is a patient of Grady Memorial Hospital

Corporation ("Grady" or "Defendant"), and brings this class action against

Defendant in his individual capacity and on behalf of all others similarly situated,

---

1 In order to avoid compounding the injuries and damages which give rise to this putative class action lawsuit and given the highly sensitive nature of the non-public, confidential and highly sensitive personal health information disclosed by Defendant without consent, Plaintiff will move this Honorable Court for permission to proceed anonymously. *See, e.g.*, *Doe v. Archdiocese of Atlanta*, 328 Ga. App. 324, n. 20, 761 S.E.2d 864, 869 (2014).

1

and alleges, upon personal knowledge as to his own actions, his counsels' investigation, and upon information and belief as to all other matters, as follows:

## INTRODUCTION

1.      Plaintiff brings this case to address Defendant's unlawful practice of disclosing Plaintiff's and Class Members' confidential personally identifiable information ("PII") and protected health information ("PHI") (collectively referred to as "Private Information") to unauthorized third parties, including Alphabet, Inc. d/b/a Google ("Google").

2.      Grady installed tracking tools on its website (https://www.gradyhealth.org/, the "Website") and its "Grady MyChart" patient portal ("Patient Portal") to share patients' Private Information as they used the Web Properties.[2]

3.      At a minimum, the tracking tools installed on the Web Properties include the Google Analytics tool, Google DoubleClick, Google Ads, and other related tracking tools (collectively, "Tracking Technologies" or "Tracking Tools").

4.      The Tracking Technologies allow unauthorized third parties to intercept the contents of patients' communications, receive and view patients' Private Information, mine it for purposes unrelated to the provision of healthcare,

---

[2] As used herein, "Web Properties" includes the Website, Patient Portal, and related websites not presently known to Plaintiff.

2

and further monetize it to deliver targeted advertisements to specific individuals.

5. Defendant owns and controls https://www.gradyhealth.org/ ("Defendant's Website" or the "Website"), which it encourages patients to use for booking medical appointments, locating physicians and treatment facilities, communicating medical symptoms, searching medical conditions and treatment options, signing up for events and classes, and more.

6. Included within Defendant's Website is the MyChart Patient Portal, which Defendant encourages patients to sign up for and use so that they can more conveniently book appointments and schedule visits, review their health records and test results, pay bills, communicate with service providers, request prescription refills, and complete medical forms virtually and remotely.

7. Unbeknownst to patients, Defendant installed tracking technologies ("Tracking Tools") onto its Website, including, upon information and belief, the Patient Portal.[3] These Tracking Tools, such as pixels, web beacons, or cookies, track and collect communications with the Defendant via the Website and surreptitiously force the user's web browser to send those communications to undisclosed third parties, such as Google.

---

[3] MyChart is run by a third party, Epic Software Systems (Epic), which permits its partners to deploy "custom analytics scripts." Tracking technologies can be embedded into the code, and because of Defendant's pervasive use of tracking technologies on its main page, upon information and belief Plaintiff avers that tracking technologies were also deployed in the MyChart Portal.

8.    Defendant used Tracking Tools to divulge Private Information of Users of its Web Properties, like Plaintiff, for marketing, re-marketing, and analytics purposes, despite its express promise that "Grady Health System does not share any personally identifiable information of any individual with any third party unrelated to Grady Health System, except in situations where we must provide information for legal purposes or investigations, or if so directed by the patient through a proper authorization."[4]

9.    Plaintiff and Class Members used the Website to submit information related to their past, present, or future health conditions, including, for example, searches for specific health conditions and treatment and the booking of medical appointments with specific physician. Such Private Information would allow the third party (e.g., Google) to know that a specific patient was seeking confidential medical care from Defendant, as well as the type of medical care being sought. This disclosure would also allow a third party to reasonably infer that a specific patient was being treated for a specific type of medical condition such as cancer, pregnancy, or addiction.

10.    Google connects user data from Defendant's Website to the individual's Google Account through unique identifiers.

---

[4] *See* https://www.gradyhealth.org/privacy-security/ (last visited June 3, 2026).

11.     Similarly, Google "stores users' logged-in identifier on non-Google websites…in its logs … Whenever a user logs-in on non-Google websites, whether in private browsing mode or non-private browsing mode, the same identifier is associated with the data Google collects from the user's browsing activities on that website. Google further logs all such data (private and non-private) within the same logs and uses these data for serving personalized ads."[5]

12.     Simply put, the health information disclosed through the tracking technologies is personally identifiable.

13.     Defendant is a healthcare entity and thus its disclosure of health and medical communications is tightly regulated. The United States Department of Health and Human Services (HHS) has established "Standards for Privacy of Individually Identifiable Health Information" (also known as the "Privacy Rule") governing how health care providers must safeguard and protect Private Information. Under the Health Insurance Portability and Accountability Act of 1996 (HIPAA) Privacy Rule, no health care provider can disclose a person's personally identifiable protected health information to a third party without express written authorization.

---

[5] *See Brown v. Google LLC*, 685 F.Supp.3d 909, 925 fn. 11 (N.D. Cal. Aug. 7, 2023) (Order denying summary judgment and citing internal evidence from Google employees).

14.     In addition, as explained further below, HHS has specifically warned healthcare regulated entities that tracking technologies like those used by Defendant transmit personally identifying information to third parties, both on the public portion of the website and within the password-protection patient portal, and that such information should not be transmitted without a HIPAA-acceptable written authorization from patients.

15.     The Federal Trade Commission (FTC) has also warned hospitals and other entities that "even if you are not covered by HIPAA, you still have an obligation to protect against impermissible disclosures of personal health information under the FTC Act and the FTC Health Breach Notification Rule."

16.     Even more troubling, the Office for Civil Rights ("OCR") at both HHS and the FTC issued these specific warnings to Grady regarding its "serious privacy and security risks related to online tracking technologies that may be present on your website or mobile application" in a letter dated July 20, 2023, which is still featured on HHS's website.[6]

17.     Despite these warnings, Defendant has embedded hidden Tracking Tools on its Website, essentially planting a bug on patients' web browsers that forced

---

[6] *OCR FTC Letters Re Use of Online Tracking Technologies,* at 121-123, https://www.hhs.gov/sites/default/files/ocr-ftc-letters-re-use-online-tracking-technologies.pdf (last visited June 10, 2026).

them disclose private and confidential communications to third parties. Defendant did not disclose the presence of these Tracking Tools to its patients and Website users.

18.    Healthcare patients simply do not anticipate or expect that their trusted healthcare provider will send personal health information or confidential medical information collected via its webpages to a hidden third party – let alone Google, which has a sordid history of privacy violations in pursuit of ever-increasing advertising revenue – without the patients' consent. Neither Plaintiff nor any other Class Member signed a written authorization permitting Defendant to send their Private Information to Google.

19.    Defendant breached its statutory and common law obligations to Plaintiff and Class Members by, inter alia,: (i) failing to remove or disengage technology that was known and designed to share web-users' information; (ii) failing to obtain the written consent of Plaintiff and Class Members to disclose their Private Information to Google or others; (iii) failing to take steps to block the transmission of Plaintiff's and Class Members' Private Information through Tracking Tools like Google Analytics; (iv) failing to warn Plaintiff and Class Members; and (v) otherwise failing to design, and monitor its Website to maintain the confidentiality and integrity of patient Private Information.

20.    As a result of Defendant's conduct, Plaintiff and Class Members have suffered numerous injuries, including: (i) invasion of privacy; (ii) loss of benefit of the bargain, (iii) diminution of value of the Private Information, (iv) statutory damages, and (v) the continued and ongoing risk to their Private Information.

21.    Plaintiff seeks to remedy these harms and brings causes of action for (1) breach of fiduciary duty/confidentiality; (2) violation of the Electronics Communication Privacy Act ("ECPA") 18 U.S.C. § 2511(1) – unauthorized interception, use, and disclosure; (3) invasion of privacy; (4) breach of implied contract; (5) unjust enrichment; (6) negligence; (7) violation of the Georgia Uniform Deceptive Trade Practices Act, GA Code Ann. §§10-1-370.

## **PARTIES**

22.    Plaintiff John Doe is a natural person and citizen of Georgia where he intends to remain.

23.    Defendant Grady Memorial Hospital Corporation is a nonprofit healthcare system serving patients throughout the Atlanta region, and is headquartered at 80 Jesse Hill Jr. Drive SE Atlanta, GA 3030.

24.    Grady has 16 locations serving Atlanta patients, with one of the nation's best trauma centers. They have 953 beds and treat over 900,000 patients every year.

25. Defendant is a covered entity under the Health Insurance Portability and Accountability Act of 1996 (42 U.S.C. § 1320d and 45 C.F.R. Part 160-45 C.F.R. Part 162, and 45 C.F.R. Part 164 (HIPAA)).

## JURISDICTION & VENUE

26. This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1332(d) because this case is brought as a class action where the amount in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs, there are more than 100 members in the proposed class, and at least one member of the class, is a citizen of a state different from Defendant.

27. This Court has federal question jurisdiction under 28 U.S.C. § 1331 because this Complaint alleges question of federal laws under the ECPA (18 U.S.C. § 2511, *et seq.*).

28. This Court has personal jurisdiction over Defendant because its principal place of business is in this District and the acts and omissions giving rise to Plaintiff's claims occurred in and emanated from this District.

29. Venue is proper under 28 U.S.C § 1391(b)(1) because Defendant's principal place of business is in this District.

## COMMON FACTUAL ALLEGATIONS

**A.     U.S. Department of Health and Human Services and Federal Trade Commission Have Warned about Use of Tracking Tools by Healthcare Providers**

30.     Many modern websites—such as e-commerce merchant and entertainment websites—use tracking technologies like web beacons, JavaScript tags, and software development kits ("SDKs") to monitor website and mobile app users' activities and communications and send that information to third parties for use in marketing.

31.     What may be permissible or expected on a website like Walmart.com simply isn't appropriate on a healthcare providers' website, and federal agencies and courts around the country have come to recognize that this principle is fundamental to preserving patient privacy in the modern internet era.

32.     More and more healthcare providers not just expect, but actually require, their patients to use web technologies in conjunction with their medical care. In order to obtain medical care from Grady Health and use its services, patients are required to communicate certain private medical information to Grady via its Web Properties.

33.     Because of this, healthcare providers' Web Properties are expected to maintain and preserve the confidential nature of patients' online activities and communications.

34.    In December 2022, HHS issued a bulletin (the "HHS Bulletin") warning regulated entities, such as Grady, not to use Tracking Tools:

> Regulated entities [those to which HIPAA applies] are not permitted to use tracking technologies in a manner that would result in impermissible disclosures of PHI to tracking technology vendors or any other violations of the HIPAA Rules. ***For example, disclosures of PHI to tracking technology vendors for marketing purposes, without individuals' HIPAA-compliant authorizations, would constitute impermissible disclosures.***[7]

In other words, the HHS has expressly stated that the use of Tracking Tools, as described herein, violates HIPAA Rules unless the entity has obtained a HIPAA-complaint authorization from their patients. In addition to HIPAA-complaint authorizations, covered-entities must also execute a HIPAA-complaint Business Associate agreement with any entity with whom it shares patients' information.

35.    The HHS Bulletin further warns that:

> While it has always been true that regulated entities may not impermissibly disclose PHI to tracking technology vendors, ***because of the proliferation of tracking technologies collecting sensitive information, now more than ever, it is critical for regulated entities to ensure that they disclose PHI only as expressly permitted or required by the HIPAA Privacy Rule.***[8]

---

[7] *See Use of Online Tracking Technologies by HIPAA Covered Entities and Business Associates* (Dec. 1, 2022), available at https://www.hhs.gov/hipaa/for-professionals/privacy/guidance/hipaa-online-tracking/index.html (last visited June 18, 2023) (emphasis added).

[8] *Id.*

36.    Moreover, Protected Information is not limited exclusively to patient portals (like MyChart) but extends to non-password protected (i.e., "unauthenticated") webpages, including Grady's Website:

> Tracking technologies on a regulated entity's unauthenticated webpage *that addresses specific symptoms or health conditions,* such as pregnancy or miscarriage*, or that permits individuals to search for doctors or schedule appointments without entering credentials* may have access to PHI in certain circumstances. *For example, tracking technologies could collect an individual's email address and/or IP address when the individual visits a regulated entity's webpage to search for available appointments with a health care provider. In this example, the regulated entity is disclosing PHI to the tracking technology vendor, and thus the HIPAA Rules apply.*[9]

37.    HHS and the FTC also issued a joint-letter, once again admonishing entities like Defendant to stop using Tracking Tools:

> If you are a covered entity or business associate ("regulated entities") under HIPAA, you must comply with the HIPAA Privacy, Security, and Breach Notification Rules (HIPAA Rules), with regard to protected health information (PHI) that is transmitted or maintained in electronic or any other form or medium. *The HIPAA Rules apply when the information that a regulated entity collects through tracking technologies or discloses to third parties (e.g., tracking technology vendors) includes PHI. . .* Even if you are not covered by HIPAA, you still have an obligation to protect against impermissible disclosures of personal health information under the FTC Act and the FTC Health Breach Notification Rule. . . As recent FTC enforcement actions demonstrate, it is essential to monitor data flows of health

---

[9] *Id*. (emphasis added)

information to third parties via technologies you have integrated into your website or app. The disclosure of such information without a consumer's authorization can, in some circumstances, violate the FTC Act as well as constitute a breach of security under the FTC's Health Breach Notification Rule.[10]

## B.    Underlying Web Technology

38.    To understand Grady's unlawful data-sharing, it is important first to understand basic web design and tracking tools.

39.    Devices (such as computer, tablet, or smart phone) accesses web content through a web browser (e.g., Google's Chrome browser, Mozilla's Firefox browser, Apple's Safari browser, and Microsoft's Edge browser).

40.    Every website is hosted by a computer "server" that holds the website's contents and through which the entity in charge of the website exchanges communications with Internet users' client devices via their web browsers.

41.    Web communications consist of HTTP or HTTPS Requests and HTTP or HTTPS Responses, and any given browsing session may consist of thousands of individual HTTP Requests and HTTP Responses, along with corresponding cookies:

- **Universal Resource Locator ("URL")**: a web address.

- **HTTP Request**: an electronic communication sent from the client device's browser to the website's server. GET Requests are one of the

---

[10] *Re: Use of Online Tracking Technologies*, U.S. Dept. of Health & Hum. Servs. and Fed. Trade. Comm'n (July 20, 2023), https://www.ftc.gov/system/files/ftc_gov/pdf/FTC-OCR-Letter-Third-Party-Trackers-07-20-2023.pdf

most common types of HTTP Requests. In addition to specifying a particular URL, GET Requests can also send data to the host server embedded inside the URL, and can include cookies.

- **Cookies**: a small text file that can be used to store information on the client device which can later be communicated to a server or servers. Cookies are sent with HTTP Requests from client devices to the host server. Some cookies are "third-party cookies," which means they can store and communicate data when visiting one website to an entirely different website.

- **HTTP Response**: an electronic communication that is sent as a reply to the client device's web browser from the host server in response to an HTTP Request. HTTP Responses may consist of a web page, another kind of file, text information, or error codes, among other data.[11]

42.     Every website is comprised of Markup and "Source code." Source code is simply a set of instructions that commands the website visitor's browser to take certain actions when the web page first loads or when a specified event triggers the code. Source code is essentially the back of the website, and the user does not see what happens in the source code.

43.     Source code may also command a web browser to send data transmissions to third parties in the form of HTTP Requests quietly executed in the background without notifying the web browser's user. Tracking Tools are embedded in the Source Code and instruct the Website to send a second set of transmissions to the third party's servers, in this case, those are sent to Google.

---

[11] One browsing session may consist of hundreds or thousands of individual HTTP Requests and HTTP Responses.

44. By contrast, the Markup is the façade of the Website and what the user sees.

**C. Tracking Tools**

45. Third parties, like Google, offer Tracking Tools as software that advertisers can integrate into their webpages, mobile applications, and servers, thereby enabling the interception and collection of user communications and activity on those platforms. The Tracking Tools are used to gather, identify, target, and market products and services to individuals.

46. In general, Tracking Tools are automatically configured to capture "Standard Events" such as when a user visits a particular webpage, that webpage's URL and metadata, button clicks, etc. Advertisers, such as Defendant, can track other user actions and communications and can create their own tracking parameters by customizing the software on their website.

47. When a user accesses a webpage that is hosting Tracking Tools, the user's communications with the host webpage are instantaneously and surreptitiously duplicated and sent to the third party. For example, the Google Analytics tool on Defendant's Website causes the user's web browser to instantaneously duplicate the contents of the communication with the Website and send the duplicate from the user's browser directly to Google Analytics server.

15

48.     Google Analytics tracks what a user communicates to Defendant's website.[12]

49.     Notably, transmissions only occur on webpages that contain Tracking Tools.[13] Thus, Plaintiff's and Class Member's Private Information would not have been disclosed to Google via this technology but for Defendant's decisions to install the Tracking Tools on its Website.

**D.     Defendant Disclosed Plaintiff's and Class Members' Private Information to Google Using Tracking Tools**

50.     In this case, Defendant employed Tracking Tools, including the Google Analytics tool, to intercept, duplicate, and re-direct Plaintiffs' and Class Members' Private Information to Google.

51.     Defendant's Source Code manipulates the patient's browser by secretly instructing it to duplicate the patient's communications (HTTP Requests) with

---

[12] *Comparing Google Analytics vs Facebook Pixel*, Boltic, https://www.boltic.io/blog/google-analytics-vs-facebook-pixel#:~:text=Google%20Analytics%20is%20a%20comprehensive,time%20on%20site%2C%20and%20conversions.&text=On%20the%20other%20hand%2C%20Facebook,user%20actions%20on%20your%20website. (last visited Jan. 26, 2024)

[13] Defendant's Google Analytics tool stores a client ID in a first-party cookie named _ga (also identified as a cid) to distinguish unique users and their sessions on your website. Analytics doesn't store the client ID when analytics storage is disabled through Consent Mode." https://support.google.com/analytics/answer/11593727?hl=en#:~:text=Google%20Analytics%20stores%20a%20client,is%20disabled%20through%20Consent%20Mode. (last visited Jan. 26, 2024).

Defendant and to send those communications to Google. These transmissions occur contemporaneously, invisibly, and without the patient's knowledge.

52.    Thus, without its patients' consent, Defendant has effectively used its source code to commandeer and "bug" or "tap" it patients' computing devices, Google, and other third parties to listen in on all of their communications with Defendant and thereby intercept those communications, including Private Information.

53.    The Tracking Tools allow Defendant to optimize the delivery of ads, measure cross-device conversions, create custom audiences, and decrease advertising and marketing costs. However, Defendant's Website do not rely on the Tracking Tools in order to function.

54.    While seeking and using Defendant's services as a medical provider, Plaintiff and Class Members communicated their Private Information to Defendant via its Website.

55.    Plaintiff and Class Members were not aware that their Private Information would be shared with third parties as it was communicated to Defendant because, amongst other things, Defendant did not disclose this fact.

56.    Plaintiff and Class Members never consented, agreed, authorized, or otherwise permitted Defendant to disclose their Private Information to third parties,

17

nor did they intend for anyone other than Defendant to be a party to their communications (many of them highly sensitive and confidential) with Defendant.

57.    Defendant's Tracking Tools sent non-public Private Information to Google, including but not limited to Plaintiff's and Class Members': (1) status as medical patients; (2) health conditions; (3) desired medical treatment or therapies; (4) desired locations or facilities where treatment was sought; (5) phrases and search queries (such as searches for symptoms, treatment options, or types of providers); and (6) searched and selected physicians and their specialties conducted via the general search bar.

58.    Importantly, the Private Information Defendant's Tracking Tools sent to third parties included personally identifying information that allowed those third parties to connect the Private Information to a specific patient. Information sent to Google was sent alongside the Plaintiff's and Class Members' unique identifier ("_ga" or "CID"), thereby allowing individual patients' communications with Defendant, and the Private Information contained in those communications, to be linked to their unique Google accounts and therefore their identity.[14]

---

[14] *Brown v. Google LLC*, Case No. 4:20-cv-3664-YGR, fn. 11 (quoting Google employee deposition testimony explaining how Google tracks user data).

18

59.    Similarly, Google users who are logged-in to their Google accounts also have an identifier that is stored in Google's logs. Google logs a user's browsing activities on non-Google websites and uses these data for serving personalized ads.

60.    Defendant deprived Plaintiff and Class Members of their privacy rights when it: (1) implemented Tracking Tools that surreptitiously tracked, recorded, and disclosed Plaintiff's and other online patients' confidential communications and Private Information; (2) disclosed patients' protected information to unauthorized third parties; and (3) undertook this pattern of conduct without notifying Plaintiff or Class Members and without obtaining their express written consent.

61.    By installing and implementing Google Analytics, Defendant caused Plaintiff's and Class Member's communications to be intercepted by and/or disclosed to Google and for those communications to be personally identifiable.

62.    As explained below, these unlawful transmissions are initiated by Defendant's source code concurrent with communications made via certain webpages.

**E.    Defendant's Tracking Tools Disseminate Patient Information Via Its Website**

63.    Examples illustrates the point. If a patient uses searches for a doctor, condition, treatment or looks to schedule an appointment on the Grady Website, they are communicating Private Information via their search parameters and pages visited

including any physician's name, areas of practice, specialty, treatments offered, gender, location, and spoken language.  Unbeknownst to the patient, every detail is sent to Google and other third parties via Defendant's Tracking Tools.

64.    When using the website to search for a provider and/or schedule an appointment, Defendant transmitted the Private Information Plaintiff and Class Members provided to it to Google every step of the way.

65.    For example, on the "Make An Appointment" feature on the top menu, a user is directed to a page with a variety of options to move forward with scheduling the appointment.

20



*Figure 1. Screenshot taken in 2026 when the User began to make an appointment using the "Make an Appointment" button on the homepage.*

66.    Thereafter, the user clicks "Screening Mammogram" in order to make an appointment for same, which then brings them to select a location.



*Figure 2: Screenshot taken in 2026 when the user initiated scheduling a "Screening Mammogram" through the Make an Appointment Tool.*

67.    Upon clicking on the "Brookhaven Health Center" button, the user is

presented with additional details and directed to click a box next to the phrase: "I

understand that this location uses a mobile mammography unit, and if I do not meet the mobility criteria, my appointment may be rescheduled.".



*Figure 3: Screenshot from 2026 illustrating what populates when the user chooses to get a mammogram at "Brookhaven Health Center," including the acknowledgment which the user is required to click before making an appointment.*

23

68.    Next, the user clicks the "Make an Appointment" button, as featured above in Figure 3. As shown below in Figure 4, Defendant's Tracking Tools transmitted the details regarding the appointment, location, and type of appointment to Google, thereby allowing the user's medical condition and sought after treatment to be linked to their individual Google account for future retargeting and exploitation. This is simply unacceptable, and there is no legitimate reason for sending this information to Google or any other third party.



*Figure 4. Screenshot taken from the user's network traffic report showing detailed information traveling to Google, including the event type*

*"make_appointment," the appointment location "Brookhaven Health Center," and the type of appointment type "appointment_type=screening-mammogram."*

69.     Although Grady's Web Properties have undergone changes since 2022, Grady continues to transmit users' search queries to Google. In the example below, the user typed the name of John Doe's physician "Dr. Christopher Dente" into the search bar, and that exact phrase was transmitted to Google as shown in the image below.



*Figure 5: Screenshot take from the user's traffic report depicting the "Payload" associated with the user's search for "Dr. Christopher Dente" activity; the exact text and phrases typed into the search bar are transmitted to www.googleadservices.com as a result of Grady's Tracking Tools.*

70.    Grady also transmits the fact that a patient has called a particular physician, and as shown below, the physician's name, phone number, and phrase "Phone Call Tracking" are transmitted to www.googleadservices.com.

| en | (404) 616-1000 |
| gtm | 45je65r2v894346971za200zd894346971xec |
| gcd | 13l3l3l3l1l1 |
| dma | 0 |
| tag_exp | 0~115938465~115938469~116701382~119027224~119034491 |
| u_w | 2560 |
| u_h | 1440 |
| url | https://www.gradyhealth.org/doctors/dr-christopher-j-dente/ |
| ref | https://www.gradyhealth.org/doctors/ |
| rcb | 9 |
| frm | 0 |
| tiba | Christopher J. Dente, MD \| Atlanta, GA \| Grady Health |
| hn | www.googleadservices.com |
| npa | 0 |
| pscdl | noapi |
| auid | 1874276022.1774555928 |
| uaa | x86 |
| uab | 64 |
| uafvl | Chromium;148.0.7778.217\|Microsoft%20Edge;148.0.3967.96\|Not%2FA)Brand;99.0.0.0 |
| uamb | 0 |
| uam | |
| uap | Windows |
| uapv | 10.0.0 |
| uaw | 0 |
| data | event=(404) 616-1000;event_category=Phone Call Tracking;event_label=(404) 616-1000 |
| rfmt | 3 |
| fmt | 3 |
| is_vtc | 1 |

*Figure 6. The image above is a screenshot that depicts what occurs, and what is transmitted to Google when a patient visits Grady's Website and clicks on their physician's phone number in order to begin a phone call.*

71.    In the examples above, the user's website activity and the contents of the user's communications are sent to Google alongside their personally identifiable information. Several different methods allow marketers and third-parties to identify individual website users, but the examples above demonstrate what happens when the website user is logged into their Google account on their web browser or device. When this happens, the website user's identity is revealed via third-party cookies that work in conjunction with the Pixel. For example, the Pixel transmits the user's CID, and allows Google to link the user's online communications and interactions to their individual Google Account.

72.    Google receives at least six cookies when Defendant's website transmits information via their tracking tool:

| Name | Value | Domain |
| --- | --- | --- |
| __Secure-3PSID | g.a000gwi5aTXavEZBCwN5ELlu7gsa1lyZeO6… | .google.com |
| __Secure-3PAPISID | Fu_inhdlyYxW9SgW/A-1N9Nz9Sg9NwkrDL | .google.com |
| __Secure-3PSIDTS | sidts-CjIBYfD7Z0SbSlhTkhxJLwzqJQIxqw0un… | .google.com |
| __Secure-3PSIDCC | ABTWhQFcU7azmy9yBosbk-9XdePI_eh5l2BS… | .google.com |
| 1P_JAR | 2024-02-27-07 | .google.com |
| NID | 512=jXjIg6l9jJ9wNCHSEgzWrCPOuizPR_ohxt… | .google.com |

*Figure 6. Screenshot from Defendant's network traffic report for Google Analytics list of cookies sent out.*

73.    When a visitor's browser has recently logged out of an account, Google compels the visitor's browser to send a smaller set of cookies:[15]

| Request Cookies | ☐ show filtered out request cookies | |
|---|---|---|
| Name | Value | Domain |
| NID | 512=hjBIZ6Er1cPLzn8cl... | .google.com |
| 1P_JAR | 2024-02-27-23 | .google.com |

*Figure 7. Screenshot from Defendants website reflecting what cookies are sent when the user isn't actively signed into their Google Account.*

74.    The NID cookie contains an encrypted Google Account ID and browser identifier.  Google, at a minimum, uses the NID cookie to identify users, and this particular cookie can stay on a user's website browser for up to 6 months to identify the users history on the website.[16]

75.    The cookies listed in the two images above are commonly referred to as third-party cookies because they were "created by a website with a domain name other than the one the user is currently visiting"—*i.e.,* Google. Although Google created these cookies, Defendant is ultimately responsible for the manner in which individual website users were identified via these cookies, and Google would not

---

[15] The screenshot below serves as example and demonstrates the types of data transmitted during an HTTP single communication session. Not pictured here and in the preceding image is the _ga cookie, which is transmitted as a first-party cookie.
[16] *Id.*

29

have received this data but for Defendant's implementation and use of the Pixel throughout its website.

76. Defendant also revealed its website visitors' identities via first-party cookies such as the _ga cookie that google uses to identify a particular browser and a user:[17]

| _ga | GA1.1.971859188.1705536762 | .gradyhealth.org |

*Figure 8. Screengrab from Defendant's network traffic report depicting the first party cookie _ga.*

77. Importantly, the _ga cookie is transmitted to Google even when the user's browser is configured to block third-party tracking cookies because, unlike the NID cookies and CID cookie, the _fbp cookie functions as a first-party cookie— i.e. a cookie that was created and placed on the website by Defendant.

78. Google Analytics uses both first- and third-party cookies.

79. In summation, Google at a minimum, uses the NID, _ga, and CID cookies to link website visitors' communications and online activity with their corresponding Google Accounts, and, because the tracking tools are automatically programmed to transmit data via both first-party and third-party cookies, patients' information and identities are revealed to Google even when they have disabled third-party cookies within their web browsers.

---

[17] *Id.*

**F.      Plaintiff John Doe's Experience**

80.      Plaintiff John Doe has been a patient and received medical care at Defendant's facilities since approximately 2021 in relation to Covid-19, congestive heart failure, kidney failure, and related medical conditions and symptoms for which he received treatment.

81.      Plaintiff John Doe accessed Defendant's Web Properties at Defendant's direction and encouragement beginning in 2021.

82.      Plaintiff Doe has used Defendant's Website on numerous occasions since 2021 to communicate with Defendant in relation to the ongoing medical care he received from Defendant.

83.      Plaintiff specifically recalls using the Website to search for specialists and specific doctors, identify treatments related to his chronic heart and kidney conditions, communicate insurance information, schedule appointments, register for the patient portal, and more.

84.      During these communications, Plaintiff communicated Private Information via the Website concerning his own medical condition(s), medical symptoms, desired treatments, and other portions of the Website.

85.      Plaintiff Doe also used the Website to register for and access the password-protected patient portal login.

86.     Upon logging into the patient portal, Plaintiff Doe communicated additional Private Information concerning his medical treatment.

87.     During all relevant times, Plaintiff has had an active Google account, which he accesses from the same devices that he uses to access Defendant's Web Properties.

88.     Shortly after using the Website to search for care providers, he began seeing targeted advertisements related to his own medical symptoms, conditions, and the treatments he sought and received from Defendant.

89.     Based on the timing and specificity of these targeted advertisements, he believes his Private Information was sent to Google and other unauthorized third parties for marketing purposes via the Tracking Tools Defendant installed on it Web Properties.

90.     Through its use of the Tracking Tools, Defendant disclosed Plaintiff's highly sensitive communications and Private Information to Google, including communications that contained private and confidential information, without Plaintiff's knowledge, consent, or express written authorization.

91.     The Private Information that Google received from Defendant included specific facts concerning Plaintiff's private medical conditions, was personally identifiable (linked to Plaintiff), and was not anonymized or redacted. As a result of

Defendant's conduct, Google received an array of sensitive data points, including but not limited to, Plaintiff John Doe's:

i.  status as a patient of Grady Health;

ii.  specific activities undertaken on Defendant's Web Properties, such as the act of finding a doctor or scheduling an appointment;

iii.  unredacted descriptive URLs revealing which pages he viewed (such as "Dr. Christopher J. Dente"), which buttons he clicked, and corresponding button titles (such as "prepare for your appointment,");

iv.  health conditions and symptoms (such as seeking surgical care);

v.  treatments sought;

vi.  location;

vii.  email address, phone number, and ZIP code;

viii.  treating physicians, their corresponding specialties, and clinic locations;

ix.  patient portal logins; and

x.  insurance information.

92.  As a medical patient, Plaintiff reasonably expected that his online communications with Defendant via the Web Properties were solely between himself and Defendant and that Defendant would not transmit his Private Information to Google for marketing purposes. When he provided his Private

33

Information to Defendant and used its Web Properties, he trusted that the information would be safeguarded according to Defendant's privacy policies and the law. But for his status as Defendant's patient, he would not have disclosed his Private Information to Defendant or used its Web Properties.

93. By failing to receive the requisite consent to disclose Plaintiff's Private Information, Defendant violated its agreements with Plaintiff, its own policies, and state and federal laws.

94. Plaintiff paid for Defendant's healthcare services, which included reasonable privacy and data security protections for Plaintiff's Private Information; however, Plaintiff did not receive the privacy and security protections for which he paid.

95. Plaintiff first discovered that Defendant was using Tracking Tools to gather and disclose his Private Information in April 2026.

96. Because of Defendant's Disclosure, Plaintiff has suffered injuries, including monetary damages; loss of privacy; unauthorized disclosure of this Private Information; unauthorized access to his Private Information by third parties; use of his Private Information for advertising purposes; embarrassment, humiliation, frustration, and emotional distress; decreased value of his Private Information; lost benefit of his bargain; and increased risk of future harm resulting from further unauthorized use and disclosure of his information.

97.     Plaintiff has a continuing interest in ensuring that future communications with Defendant are protected and safeguarded from future unauthorized disclosure.

## G.     Defendant's Conduct Is Unlawful and Violated Industry Norms

### i. Defendant Violated HIPAA Standards

98.     Under Federal Law, a healthcare provider may not disclose personally identifiable, non-public medical information about a patient, a potential patient, or household member of a patient for marketing purposes without the patients' express written authorization.[18]

99.     The HIPAA Privacy Rule, located at 45 CFR Part 160 and Subparts A and E of Part 164, "establishes national standards to protect individuals' medical records and other individually identifiable health information (collectively defined as 'protected health information') and applies to health plans, health care clearinghouses, and those health care providers that conduct certain health care transactions electronically."[19]

100.    The Privacy Rule broadly defines "protected health information" ("PHI") as individually identifiable health information ("IIHI") that is "transmitted

---

[18] HIPAA, 42 U.S.C. § 1320; 45 C.F.R. §§ 164.502; 164.508(a)(3), 164.514(b)(2)(i).

[19] HHS.gov, HIPAA For Professionals (last visited April 12, 2023), https://www.hhs.gov/hipaa/forprofessionals/privacy/index.html.

by electronic media; maintained in electronic media; or transmitted or maintained in any other form or medium." 45 C.F.R. § 160.103.

101. IIHI is defined as "a subset of health information, including demographic information collected from an individual" that is: (1) "created or received by a health care provider, health plan, employer, or health care clearinghouse"; (2) "[r]elates to the past, present, or future physical or mental health or condition of an individual; the provision of health care to an individual; or the past, present, or future payment for the provision of health care to an individual"; and (3) either (a) "identifies the individual" or (b) "[w]ith respect to which there is a reasonable basis to believe the information can be used to identify the individual." 45 C.F.R. § 160.103.

102. Under the HIPPA de-identification rule, "health information is not individually identifiable only if": (1) an expert "determines that the risk is very small that the information could be used, alone or in combination with other reasonably available information, by an anticipated recipient to identify an individual who is a subject of the information" and "documents the methods and results of the analysis that justify such determination'"; or (2) "the following identifiers of the individual or of relatives, employers, or household members of the individual are removed;

    a.    Names;
    ***
    H.    Medical record numbers;

\*\*\*

J.     Account numbers;

\*\*\*

M.     Device identifiers and serial numbers;

N.     Web Universal Resource Locators (URLs);

O.     Internet Protocol (IP) address numbers; … and

R.     Any other unique identifying number, characteristic, or code…;and"

The covered entity must not "have actual knowledge that the information could be used alone or in combination with other information to identify an individual who is a subject of the information."

45 C.F.R. § 160.514.

103.   The HIPAA Privacy Rule requires any "covered entity"—which includes health care providers—to maintain appropriate safeguards to protect the privacy of protected health information and sets limits and conditions on the uses and disclosures that may be made of protected health information without authorization. 45 C.F.R. §§ 160.103, 164.502.

104.   An individual or corporation violates the HIPAA Privacy Rule if it knowingly and in violation of 42 U.S.C. §§ 1320d-1320d-9 ("Part C"): "(1) uses or causes to be used a unique health identifier; [or] (2) obtains individually identifiable health information relating to an individual." The statute states that a "person … shall be considered to have obtained or disclosed individually identifiable health information in violation of [Part C] if the information is maintained by a covered entity … and the individual obtained or disclosed such information without authorization." 42 U.S.C. § 1320d-6.

37

105.   The criminal and civil penalties imposed by 42 U.S.C. § 1320d-6 apply directly to Defendant when it is knowingly disclosing individually identifiable health information relating to an individual, as those terms are defined under HIPAA.

106.   Violation of 42 U.S.C. § 1320d-6 is subject to criminal penalties. 42 U.S.C. § 1320d-6(b). There is a penalty enhancement where "the offense is committed with intent to sell, transfer, or use individually identifiable health information for commercial advantage, personal gain, or malicious harm." In such cases, the entity that knowingly obtains individually identifiable health information relating to an individual shall "be fined not more than $250,000, imprisoned not more than 10 years, or both."

107.   In Guidance regarding Methods for De-identification of Protected Health Information in Accordance with the Health Insurance Portability and Accountability Act Privacy Rule, the HHS instructs:

> Identifying information alone, such as personal names, residential addresses, or phone numbers, would not necessarily be designated as PHI. For instance, if such information was reported as part of a publicly accessible data source, such as a phone book, then this information would not be PHI because it is not related to health data… If such information was listed with health condition, health care provision, or payment data, such as an indication that the individual was treated at a certain clinic, then this information would be PHI.[20]

---

[20]https://www.hhs.gov/sites/default/files/ocr/privacy/hipaa/understanding/coveredentities/De-identification/hhs_deid_guidance.pdf (last visited Nov. 3, 2022).

38

108. In its guidance for Marketing, the HHS further instructs:

> The HIPAA Privacy Rule gives individuals important controls over whether and how their protected health information is used and disclosed for marketing purposes. With limited exceptions, the Rule requires an individual's written authorization before a use or disclosure of his or his protected health information can be made for marketing. … Simply put, a covered entity may not sell protected health information to a business associate or any other third party for that party's own purposes. Moreover, *covered entities may not sell lists of patients to third parties without obtaining authorization from each person on the list*. (Emphasis added).[21]

109. As alleged above, there is an HHS Bulletin that highlights the obligations of "regulated entities," which are HIPAA-covered entities and business associates, when using tracking technologies.[22]

110. The Bulletin expressly provides that "[r]egulated entities are not permitted to use tracking technologies in a manner that would result in impermissible disclosures of PHI to tracking technology vendors or any other violations of the HIPAA Rules."

---

[21]https://www.hhs.gov/sites/default/files/ocr/privacy/hipaa/understanding/coveredentities/marketing.pdf (last visited June 11, 2026)

[22] *See* https://www.hhs.gov/hipaa/for-professionals/privacy/guidance/hipaa-online-tracking/index.html (last visited June 11, 2026)

111. Moreover, HHS issued warnings to regulated entites, specifically Defendant, regarding tracking technologies.[23]

112. Defendant's actions violated HIPAA Rules per this Bulletin and the subsequent warnings it issued to Defendant.

### ii. Defendant Violated Georgia State Law

113. Georgia has established policies and procedures for the maintenance, preservation, and storage of patient medical records.

114. O.C.G.A. § 31-33-2 states that providers, which are defined to include hospitals, O.C.G.A. § 31-33-1, may only release medical records "upon written request from the patient or a person authorized to have access to the patient's record under an advance directive for health care, a psychiatric advance directive, or a durable power of attorney for health care for such patient," where "the record request [is] accompanied by: [a]n authorization in compliance with the federal Health Insurance Portability and Accountability Act of 1996, 42 U.S.C. Section 1320d-2, et seq., and regulations implementing such act" and "a signed written authorization indicating that he or she is authorized to have access to the patient's records[.]"."

---

[23] *OCR FTC Letters Re Use of Online Tracking Technologies,* at 121-123, https://www.hhs.gov/sites/default/files/ocr-ftc-letters-re-use-online-tracking-technologies.pdf (last visited June 10, 2026)

115.  In addition, O.C.G.A. § 31-33-8 provides that health records in electronic format are "subject to all applicable federal laws governing the security and confidentiality of a patient's personal health information."

116.  Thus, Georgia law requires all hospitals, including Grady, to maintain all medical records and information within their control as confidential, rendering Grady's actions with respect to the interception and disclosure of its patients' Private Information to Google unlawful under Georgia law.

### iii. Defendant Violated Industry Standards

117.  A medical provider's duty of confidentiality is a cardinal rule and is embedded in the physician-patient and hospital-patient relationship.

118.  The American Medical Association's ("AMA") Code of Medical Ethics contains numerous rules protecting the privacy of patient data and communications.

119.  AMA Code of Ethics Opinion 3.1.1 provides:

Protecting information gathered in association with the care of the patient is a core value in health care… Patient privacy encompasses a number of aspects, including, … personal data (informational privacy)

120.  AMA Code of Medical Ethics Opinion 3.2.4 provides:

Information gathered and recorded in association with the care of the patient is confidential. Patients are entitled to expect that the sensitive personal information they divulge will be used solely to enable their physician to most effectively provide needed services. Disclosing information for commercial purposes without consent undermines trust,

41

violates principles of informed consent and confidentiality, and may harm the integrity of the patient-physician relationship. Physicians who propose to permit third-party access to specific patient information for commercial purposes should: (A) Only provide data that has been de-identified. [and] (b) Fully inform each patient whose record would be involved (or the patient's authorized surrogate when the individual lacks decision-making capacity about the purposes for which access would be granted.

121.    AMA Code of Medical Ethics Opinion 3.3.2 provides:

Information gathered and recorded in association with the care of a patient is confidential, regardless of the form in which it is collected or stored. Physicians who collect or store patient information electronically…must…:(c ) release patient information only in keeping ethics guidelines for confidentiality.

**H.    Grady's Privacy Policies and Promises**

122.    Defendant's Privacy Policies represent to Plaintiff and Class Members that Defendant will keep Private Information private and confidential, and it will only disclose Private Information under certain circumstances.

123.    Defendant published a Privacy Policy that represent to Users that Grady will keep sensitive information confidential and that it will only disclose PII and PHI provided to it under certain circumstances, none of which apply here.[24]

---

[24] *See* Privacy Policy, https://www.gradyhealth.org/privacy-security/ (last visited June 8, 2026).

42

124.    Defendant's separate Notice of Privacy Practices assures Plaintiff and Class Members that Grady is "required by law to keep your medical information confidential in accordance with legal requirements."[25]

125.    Defendant's Notice of Privacy Practices explains Defendant's duties with respect to PHI and the exceptions for when Defendant can use and disclose Plaintiffs' and Class Members' PHI. These categories include, *inter alia,* for treatment, for payment, and health care operations.[26] These categories do not include advertising, marketing, targeting or other third-party website usage.

126.    Importantly, Defendant also promises that it will not share Plaintiff's or Class Members PHI without "written permission." What is more troublesome, is that Defendant expressly promises: "uses and disclosures of your medical information not covered by this Notice or the laws and regulations that apply to Grady Health System will be made only with your written permission, ***this includes uses and disclosures of your medical information for marketing purposes***, the sale of your medical information, and most uses and disclosures of psychotherapy notes."[27]

---

[25] *See* Notice of Privacy Practices, https://www.gradyhealth.org/wp-content/uploads/Summary-and-Notice-of-Privacy-Practices-Updated-April-2022.pdf (last visited June 8, 2026).
[26] *Id.*
[27] *Id.* (emphasis added).

43

127.   Defendant's Privacy Policy makes a similar promise that it will not disclose Plaintiff's or Class Member's PHI without one's "written permission."[28]

128.   Notwithstanding these representations, Defendant installed Tracking Tools on its Web Properties and, thereafter, began to automatically transmit extensive PHI from everyone who visited its Web Properties to Google.

129.   After receiving IIHI communicated on Defendant's Web Properties, Google analyzes and uses this information for its own commercial purposes that include building more fulsome profiles of its Users' preferences and traits and selling targeted advertisements based on this information. Google also receives an additional commercial benefit from Defendant's use of Google's Tracking Tools, namely that it provides Defendant with a greater incentive to advertise on Google's platforms.

130.   Defendant violated its own Privacy Policies by unlawfully intercepting and disclosing Plaintiff's and Class Members' Private Information to Google and third parties without adequately disclosing that it shared Private Information with third parties without acquiring the specific patients' written consent or authorization to share the Private Information.

---

[28] *See* Privacy Policy at "Other Uses of Medical Information"; https://www.gradyhealth.org/privacy-security/ (last visited June 8, 2026)

## I.    Plaintiff's and Class Members' Expectation of Privacy

131.  Plaintiff and Class Members were aware of Defendant's duty of confidentiality when they sought medical services from Defendant.

132.  Indeed, at all times when Plaintiff and Class Members provided their Private Information to Defendant, they all had a reasonable expectation that the information would remain private and that Defendant would not share the Private Information with third parties for a commercial purpose, unrelated to patient care.

133.  Personal data privacy and obtaining consent to share Private Information are material to Plaintiff and Class Members.

134.  Plaintiff's and Class Members' reasonable expectations of privacy in their Private Information are grounded in, among other things, Defendant's status as a healthcare provider, Defendant's common law obligation to maintain the confidentiality of patients' Private Information, state and federal laws protecting the confidentiality of medical information, state and federal laws protecting the confidentiality of communications and computer data, state laws prohibiting the unauthorized use and disclosure of personal means of identification, and Defendant's express and implied promises of confidentiality.

135.  Plaintiff and Class Members would not have used Defendant's Website, would not have provided their Private Information to Defendant, and would not have

45

paid for Defendant's healthcare services, or would have paid less for them, had they known that Defendant would disclose their Private Information to third parties.

## I.      Patients Have Protectable Property Interests in their IIHI

136.   On information and belief, through the use of the Tracking Tools on Defendant's Website, Defendant also disclosed and otherwise assisted third parties with intercepting Plaintiff's and Class Members' Computer IP addresses. Property is the right of any person to possess, use, enjoy or dispose of a thing, including intangible things like data and communications. Plaintiff and Class Members have a vested property right in their IIHI.

137.   Federal and state laws grant patients the right to protect the confidentiality of data that identifies them as patients of a particular healthcare provider and restrict the use of their health data, including their status as a patient, to only uses related to their care or otherwise authorized by federal or state law in the absence of patient authorization.

138.   A patient's right to protect the confidentiality of their health data and restrict access to this data is valuable.

139.   In addition, patients enjoy property rights in the privacy of their health communications under statutes such as HIPAA. State health privacy laws and American courts have also long recognized common law property rights in the

content of a person's communications that are not to be used or disclosed to others without authorization.

140. Property rights in communications and information privacy are established by:

(a)    The Electronic Communications Privacy Act, including Title I (the Wiretap Act); Title II (the Stored Communications Act); and Title III (the Pen Register Act); and

(b)    Common law information property rights regarding the exclusive use of confidential information that have existed for centuries and continue to exist, *see Folsom v. Marsh*, 9 F.Cas. 342, 346 (C.C.D. Mass. 1841) (Story, J); *Baker v. Libbie*, 210 Mass. 599, 602 (1912); *Denis v. LeClerc*, 1 Mart. (La.) 297 (1811).

141. Defendant's unauthorized interception and disclosure of Plaintiff's and Class Members' IIHI violated their property rights to control how their data and communications are used and who may be the beneficiaries of their data and communications.

**J.    Defendant Was Enriched and Benefitted from the Use of The Tracking Tools and Unauthorized Disclosures**

142. The primary motivation and a determining factor in Defendant's interception and disclosure of Plaintiff's and Class Members' Private Information was to commit criminal and tortious acts in violation of federal and state laws as

47

alleged herein, namely, the use of patient data for advertising in the absence of express written consent. Defendant's further use of the Private Information after the initial interception and disclosure for marketing and revenue generation was in violation of HIPAA and an invasion of privacy. In exchange for disclosing the Private Information of its patients, Defendant is compensated by Google in the form of enhanced advertising services and more cost-efficient marketing on its platform.

143.   Retargeting is a form of online marketing that targets users with ads based on their previous internet communications and interactions.

144.   Upon information and belief, as part of its marketing campaign, Defendant re-targeted patients and potential patients to get more patients to use its services. Defendant did so through use of the intercepted patient data it obtained, procured, and/or disclosed in the absence of express written consent.

145.   By utilizing the Tracking Tools, the cost of advertising and retargeting was reduced through further use of the unlawfully intercepted and disclosed Private Information, thereby benefitting Defendant while invading the privacy of Plaintiff and Class Members and violating their rights under federal and Georgia law.

**K.    Plaintiff's and Class Members' Private Information Had Financial Value**

146.   Plaintiff's data and Private Information has economic value. Google regularly uses data that it acquires to create custom audiences. Google has

recognized the value of user data and has even instituted a pilot program in which it pays users $3 per week to track them online.

147.   Data harvesting is one of the fastest growing industries in the country, and consumer data is so valuable that it has been described as the "new oil." Conservative estimates suggest that in 2018, Internet companies earned $202 per American user from mining and selling data. That figure is only due to keep increasing; estimates for 2022 are as high as $434 per user, for a total of more than $200 billion industry wide.

148.   The value of health data in particular is well-known and has been reported on extensively in the media. For example, Time Magazine published an article in 2017 titled "How Your Medical Data Fuels a Hidden Multi-Billion Dollar Industry" in which it described the extensive market for health data and observed that the market for information was both lucrative and a significant risk to privacy.[29]

149.   Similarly, CNBC published an article in 2019 in which it observed that "[d]e-identified patient data has become its own small economy: There's a whole market of brokers who compile the data from providers and other health-care organizations and sell it to buyers."[30]

---

[29] *See* https://time.com/4588104/medical-data-industry/ (last visited June 11, 2026).
[30] *See* https://www.cnbc.com/2019/12/18/hospital-execs-say-theyre-flooded-with-requests-for-your-health-data.html (last visited April 23, 2026).

**TOLLING**

150. Any applicable statute of limitations has been tolled by the delayed discovery rule because Plaintiff did not know (and had no way of knowing) that his PII and PHI was intercepted and unlawfully disclosed to unauthorized third parties via the Tracking Tools.

151. Further, any applicable statutes of limitation have been tolled by Defendant's knowing and active concealment of its incorporation of the Tracking Tools into its Web Properties, which are entirely invisible to website users.

152. Through no fault or lack of diligence, Plaintiff and Class Members were deceived and could not reasonably discover Defendant's deception and unlawful conduct.

153. Plaintiff was not aware of the information essential to pursue his claims.

154. Defendant had exclusive knowledge that its Web Properties incorporated the Tracking Tools and yet failed to disclose to its patients, including Plaintiff and Class Members, that by seeking medical care through its Website, Plaintiff's and Class Members' Private Information would be disclosed or released to Google and other unauthorized third parties.

155. Under the circumstances, Defendant was under a duty to disclose the nature, significance, and consequences of its collection and treatment of its patients' Private Information. In fact, to the present, Defendant has not conceded,

acknowledged, or otherwise indicated to its patients that it has disclosed or released their Private Information to unauthorized third parties. Accordingly, Defendant is estopped from relying on any statute of limitations.

156. Moreover, all applicable statutes of limitation have also been tolled pursuant to the discovery rule.

157. The earliest that Plaintiff or Class Members, acting with due diligence, could have reasonably discovered Defendant's conduct would have been shortly before the filing of this suit.

## CLASS ACTION ALLEGATIONS

158. Plaintiff brings this action on behalf of himself and on behalf of all other persons similarly situated ("the Class") pursuant to Rule 23(b)(2), 23(b)(3), and 23(c)(4) of the Federal Rules of Civil Procedure.

159. The Nationwide Class that Plaintiff seeks to represent is defined as follows:

> All individuals residing in the United States Private Information was disclosed to a third party without authorization or consent through the Meta Collection Tools on Defendant's Web Properties.

160. Excluded from the Class are Defendant, its agents, affiliates, parents, subsidiaries, any entity in which Defendant has a controlling interest, any Defendant officer or director, any successor or assign, and any Judge who adjudicates this case, including their staff and immediate family.

51

161.    Plaintiff reserves the right to modify or amend the definition of the proposed class before the Court determines whether certification is appropriate.

162.    Numerosity, Fed R. Civ. P. 23(a)(1). The Class Members are so numerous that joinder of all members is impracticable. Upon information and belief, there are hundreds of thousands of individuals whose PII and PHI may have been improperly disclosed to Google, and the Class is identifiable within Defendant's records.

163.    Commonality, Fed. R. Civ. P. 23(a)(2) and (b)(3). Questions of law and fact common to the Class exist and predominate over any questions affecting only individual Class Members. These include:

a.    Whether and to what extent Defendant had a duty to protect the Private Information of Plaintiff and Class Members;

b.    Whether Defendant had duties not to disclose the Private Information of Plaintiff and Class Members to unauthorized third parties;

c.    Whether Defendant adequately, promptly, and accurately informed Plaintiff and Class Members that their Private Information would be disclosed to third parties;

d.    Whether Defendant violated the law by failing to promptly notify Plaintiff and Class Members that their Private Information had been compromised;

e.    Whether Defendant adequately addressed and fixed the practices which permitted the disclosure of patient Private Information;

f.    Whether Defendant engaged in unfair, unlawful, or deceptive practices by failing to safeguard the Private Information of Plaintiff and Class Members;

g.    Whether Defendant's conduct violated the Georgia's Uniform Deceptive Trade Practices Act, GA Code An §§ 10-1-370;

h.    Whether Plaintiff and Class Members are entitled to actual, consequential, and/or nominal damages as a result of Defendant's wrongful conduct; and

i.    Whether Plaintiff and Class Members are entitled to injunctive relief to redress the imminent and currently ongoing harm faced as a result of Defendant's disclosure of their Private Information.

j.    Whether Defendant knowingly made false representations as to its data security and/or Privacy Policy practices

164.    <u>Typicality</u>, Fed. R. Civ. P. 23(a)(3). Plaintiff's claims are typical of those of other Class Members because all had their Private Information compromised as a result of Defendant's incorporation of the Tracking Tools, due to Defendant's misfeasance.

165.    <u>Adequacy</u>, Fed. R. Civ. P. 23(a)(4). Plaintiff will fairly and adequately represent and protect the interests of the Class Members in that Plaintiff has no

53

disabling conflicts of interest that would be antagonistic to those of the other Members of the Class. Plaintiff seeks no relief that is antagonistic or adverse to the Members of the Class and the infringement of the rights and the damages Plaintiff has suffered are typical of other Class Members. Plaintiff has also retained counsel experienced in complex class action litigation, and Plaintiff intends to prosecute this action vigorously.

166.    Superiority and Manageability, Fed. R. Civ. P. 23(b)(3). Class litigation is an appropriate method for fair and efficient adjudication of the claims involved. Class action treatment is superior to all other available methods for the fair and efficient adjudication of the controversy alleged herein; it will permit a large number of Class Members to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, and expense that hundreds of individual actions would require. Class action treatment will permit the adjudication of relatively modest claims by certain Class Members, who could not individually afford to litigate a complex claim against a large corporation like Defendant. Further, even for those Class Members who could afford to litigate such a claim, it would still be economically impractical and impose a burden on the courts.

167.    Policies Generally Applicable to the Class. Fed. R. Civ. P. 23(b)(2). This class action is also appropriate for certification because Defendant has acted or

refused to act on grounds generally applicable to the Class, thereby requiring the Court's imposition of uniform relief to ensure compatible standards of conduct toward the Class Members and making final injunctive relief appropriate with respect to the Class as a whole. Defendant's policies challenged herein apply to and affect Class Members uniformly and Plaintiff's challenge of these policies hinges on Defendant's conduct with respect to the Class as a whole, not on facts or law applicable only to Plaintiff.

168. The nature of this action and the nature of laws available to Plaintiff and Class Members make the use of the class action device a particularly efficient and appropriate procedure to afford relief to Plaintiff and Class Members for the wrongs alleged because Defendant would necessarily gain an unconscionable advantage since they would be able to exploit and overwhelm the limited resources of each individual Class Member with superior financial and legal resources; the costs of individual suits could unreasonably consume the amounts that would be recovered; proof of a common course of conduct to which Plaintiff was exposed is representative of that experienced by the Class and will establish the right of each Class Member to recover on the cause of action alleged; and individual actions would create a risk of inconsistent results and would be unnecessary and duplicative of this litigation.

169. The litigation of the claims is manageable. Defendant's uniform conduct, the consistent provisions of the relevant laws, and the ascertainable identities of Class Members demonstrate that there would be no significant manageability problems with prosecuting this lawsuit as a class action.

170. Adequate notice can be given to Class Members directly using information maintained in Defendant's records.

171. Unless a class-wide injunction is issued, Defendant may continue disclosing the Private Information of Class Members, Defendant may continue to refuse to provide proper notification to Class Members regarding the practices complained of herein, and Defendant may continue to act unlawfully as set forth in this Complaint.

172. Further, Defendant has acted or refused to act on grounds generally applicable to the Class and, accordingly, final injunctive or corresponding declaratory relief with regard to the Class Members as a whole is appropriate under Rule 23(b)(2) of the Federal Rules of Civil Procedure.

173. Issue Certification, Fed. R. Civ. P. 23(c)(4). Likewise, particular issues are appropriate for certification because such claims present only particular, common issues, the resolution of which would advance the disposition of this matter and the parties' interests therein. Such particular issues include, but are not limited to, the following:

a.      Whether Defendant owed a legal duty to not disclose Plaintiff's and Class Members' Private Information pursuant to law and its own privacy policies;

b.      Whether Defendant breached a legal duty to Plaintiff and Class Members to exercise due care in collecting, storing, using, and safeguarding their Private Information;

c.      Whether Defendant failed to comply with its own policies and applicable laws, regulations, and industry standards relating to data security;

d.      Whether Defendant adequately and accurately informed Plaintiff and Class Members that their Private Information would be disclosed to third parties;

e.      Whether Defendant failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information disclosed to third parties;

f.      Whether Class Members are entitled to actual, consequential, and/or nominal damages, and/or injunctive relief as a result of Defendant's wrongful conduct.

## COUNT I
### BREACH OF FIDUCIARY DUTY/CONFIDENTIALITY
### (On Behalf of Plaintiff and the Class)

174.    Plaintiff repeats the allegations contained in paragraphs 1-157 as if fully set forth herein and brings this Count individually and on behalf of the proposed Class.

175.    Medical providers have a duty to their patients to keep non-public medical information completely confidential, and to safeguard sensitive personal and medical information.  This duty arises from the implied covenant of trust and confidence that is inherent in the physician-patient relationship.

176.    Plaintiff and Class Members had reasonable expectations of privacy in their communications exchanged with Defendant, including communications exchanged on Defendant's Website.

177.    In light of the special relationship between Defendant and Plaintiff and Class Members, whereby Defendant became a guardian of Plaintiff's and Class Members' Private Information, Defendant became a fiduciary by its undertaking and guardianship of the Private Information, to act primarily for the benefit of its patients, including Plaintiff and Class Members: (1) for the safeguarding of Plaintiff's and Class Members' Private Information; (2) to timely notify Plaintiff and Class Members of disclosure of their Private Information to unauthorized third parties; and (3) to maintain complete and accurate records of what patient information (and where) Defendant did and does store and disclose.

178.    Contrary to its duties as a medical provider and its express and implied promises of confidentiality, Defendant installed its Tracking Tools to disclose and transmit to third parties Plaintiff's and Class Members' communications with Defendant, including Private Information and the contents of such information.

58

179.    These disclosures were made for commercial purposes without Plaintiff's or Class Members' knowledge, consent, or authorization, and were unprivileged.

180.    The unauthorized disclosures of Plaintiff's and Class Members' Private Information were intentionally caused by Defendant's employees acting within the scope of their employment. Alternatively, the disclosures of Plaintiff's and Class Members' Private Information occurred because of Defendant's negligent hiring or supervision of its employees, its failure to establish adequate policies and procedures to safeguard the confidentiality of patient information, or its failure to train its employees to properly discharge their duties under those policies and procedures.

181.    The third-party recipients included, but may not be limited to, Google. Such information was received by these third parties in a manner that allowed them to identify the Plaintiff and the individual Class Members.

182.    Defendant's breach of the common law implied covenant of trust and confidence is evidenced by its failure to comply with federal and state privacy regulations, including:

a.    By failing to ensure the confidentiality and integrity of electronic PHI Defendant created, received, maintained, and transmitted, in violation of 45 C.F.R. § 164.306(a)(1);

b.    By failing to protect against any reasonably anticipated uses or disclosures of electronic PHI that are not permitted under the privacy

rules regarding individually identifiable health information in violation of 45 C.F.R. § 164.306(a)(3);

c.      By failing to ensure compliance with the HIPAA security standard rules by its workforce in violation of 45 C.F.R. § 164.306(a)(4);

d.      By failing to obtain satisfactory assurances, including in writing, that its business associates and/or subcontractors would appropriately safeguard Plaintiff's and Class Members PHI;

e.      By failing to implement technical policies and procedures for electronic information systems that maintain electronic PHI to allow access only to those persons or software programs that have been granted access rights in violation of 45 C.F.R. § 164.312(a)(1);

f.      By failing to implement technical security measures to guard against unauthorized access to electronic protected health information that is being transmitted over an electronic communications network in violation of 45 C.F.R. § 164.312(e)(1);

g.      By impermissibly and improperly using and disclosing PHI that is and remains accessible to unauthorized persons in violation of 45 C.F.R. § 164.502, et seq.;

h.      By failing to effectively train all members of its workforce (including independent contractors) on the policies and procedures with respect to PHI as necessary and appropriate for the members of its workforce to carry out their functions and to maintain security of PHI in violation of 45 C.F.R. § 164.530(b) and 45 C.F.R. § 164.308(a)(5);

i.      By failing to keep Private Information confidential as required by O.C.G.A. § 31-33-1;

j.      By failing to keep Private Information confidential as required by O.C.G.A. § 31-33-1; and

k.      By otherwise failing to safeguard Plaintiff's and Class Members' Private Information.

183. The harm arising from a breach of provider-patient confidentiality includes mental suffering due to the exposure of private information and erosion of the essential confidential relationship between the healthcare provider and the patient.

184. As a direct and proximate cause of Defendant's unauthorized disclosures of patient personally identifiable, non-public medical information, and communications, Plaintiff and Class members were damaged by Defendant's breach in that:

a. Sensitive and confidential information that Plaintiff and Class members intended to remain private is no longer private;

b. Plaintiff and Class members face ongoing harassment and embarrassment in the form of unwanted targeted advertisements;

c. Defendant eroded the essential confidential nature of the provider-patient relationship;

d. General damages for invasion of their rights in an amount to be determined by a jury;

e. Nominal damages for each independent violation;

f. Defendant took something of value from Plaintiff and Class Members and derived benefit therefrom without Plaintiff's and Class Members' knowledge or informed consent and without compensation for such data;

g. Plaintiff and Class Members did not get the full value of the medical services for which they paid, which included Defendant's duty to maintain confidentiality;

h.      Defendant's actions diminished the value of Plaintiff's and Class Members' Private Information; and

i.      Defendant's actions violated the property rights Plaintiff and Class members have in their Private Information.

## COUNT II
## VIOLATIONS OF ELECTRONIC COMMUNICATIONS PRIVACY ACT ("ECPA")
## 18 U.S.C. § 2511(1) *et seq.*
## UNAUTHORIZED INTERCEPTION, USE, AND DISCLOSURE
### (On Behalf of Plaintiff and the Class)

185.   Plaintiff repeats the allegations contained in paragraphs 1-157 as if fully set forth herein and brings this Count individually and on behalf of the proposed Class

186.   The ECPA protects both sending and receipt of communications.

187.   18 U.S.C. § 2520(a) provides a private right of action to any person whose wire or electronic communications are intercepted, disclosed, or intentionally used in violation of Chapter 119.

188.   The transmissions of Plaintiff's Private Information to Defendant via Defendant's Website qualifies as a "communication" under the ECPA's definition in 18 U.S.C. § 2510(12).

189.    The transmissions of Plaintiff's Private Information to medical professionals qualifies as a "communication" under the ECPA's definition in 18 U.S.C. § 2510(2).

190.    **Electronic Communications**. The transmission of Private Information between Plaintiff and Class Members and Defendant via its Website with which they chose to exchange communications are "transfer[s] of signs, signals, writing,…data, [and] intelligence of [some] nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic, or photooptical system that affects interstate commerce" and are therefore "electronic communications" within the meaning of 18 U.S.C. § 2510(2).

191.    **Content.** The ECPA defines content, when used with respect to electronic communications, to "include[] *any* information concerning the substance, purport, or meaning of that communication." 18 U.S.C. § 2510(8) (emphasis added).

192.    **Interception.** The ECPA defines the interception as the "acquisition of the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other device" and "contents … include any information concerning the substance, purport, or meaning of that communication." 18 U.S.C. § 2510(4), (8).

193.    **Electronic, Mechanical, or Other Device**. The ECPA defines "electronic, mechanical, or other device" as "any device … which can be used to

63

intercept a[n] … electronic communication[.]" 18 U.S.C. § 2510(5). The following constitute "devices" within the meaning of 18 U.S.C. § 2510(5):

a.    Plaintiff's and Class Members' browsers;

b.    Plaintiff's and Class Members' computing devices;

c.    Defendant's web-servers; and

d.    The tracking tool deployed by Defendant to effectuate the sending and acquisition of patient communications

194.   Whenever Plaintiff and Class Members interacted with Defendant's Website, Defendant, through the Tracking Tools embedded and operating on its Website, contemporaneously and intentionally disclosed, and endeavored to disclose the contents of Plaintiff's and Class Members' electronic communications to Google, without authorization or consent, and knowing or having reason to know that the electronic communications were obtained in violation of the ECPA. 18 U.S.C. § 2511(1)(c).

195.   Whenever Plaintiff and Class Members interacted with Defendant's Website, Defendant, through the Tracking Tools embedded and operating on its Website, contemporaneously and intentionally used, and endeavored to use the contents of Plaintiff's and Class Members' electronic communications, for purposes other than providing health care services to Plaintiff and Class Members without

authorization or consent, and knowing or having reason to know that the electronic communications were obtained in violation of the ECPA. 18 U.S.C. § 2511(1)(d).

196.   Whenever Plaintiff and Class Members interacted with Defendant's Website, Defendant, through the Tracking Tools it embedded and operated on its Website, contemporaneously and intentionally redirected the contents of Plaintiff's and Class Members' electronic communications while those communications were in transmission, to persons or entities other than an addressee or intended recipient of such communication, including Google.

197.   Defendant's intercepted communications include, but are not limited to, the contents of communications to/from Plaintiff's and Class Members' regarding PII and PHI, treatment, medication, and scheduling.

198.   By intentionally disclosing or endeavoring to disclose the electronic communications of Plaintiff and Class Members to affiliates and other third parties, while knowing or having reason to know that the information was obtained through the interception of an electronic communication in violation of 18 U.S.C. § 2511(1)(a), Defendant violated 18 U.S.C. § 2511(1)(c).

199.   By intentionally using, or endeavoring to use, the contents of the electronic communications of Plaintiff and Class Members, while knowing or having reason to know that the information was obtained through the interception of

an electronic communication in violation of 18 U.S.C. § 2511(1)(a), Defendant violated 18 U.S.C. § 2511(1)(d).

200. Defendant intentionally used the wire or electronic communications to increase its profit margins. Defendant specifically used the Tracking Tools to track and utilize Plaintiff's and Class Members' PII and PHI for financial gain.

201. Defendant was not acting under color of law to intercept Plaintiff's and Class Members' wire or electronic communication.

202. Plaintiff and Class Members did not authorize Defendant to acquire the content of their communications for purposes of invading Plaintiff's privacy via the Pixel tracking code.

203. Any purported consent that Defendant received from Plaintiff and Class Members was not valid.

204. **Unauthorized Purpose**. Defendant intentionally intercepted the contents of Plaintiff's and Class Members' electronic communications for the purpose of committing a tortious or criminal act in violation of the Constitution or laws of the United States or of any State – namely, violations of HIPAA, the Georgia Uniform Deceptive Trade Practices Act, OCGA §16-9-93(c), and OCGA §16-11-62, and invasion of privacy, among others.

205. The ECPA provides that a "party to the communication" may be liable where a "communication is intercepted for the purpose of committing any criminal

66

or tortious act in violation of the Constitution or laws of the United States or of any State." 18 U.S.C § 2511(2)(d).

206. Defendant is a "party to the communication" with respect to patient communications. However, Defendant's simultaneous, unknown duplication, forwarding, and interception of Plaintiff's and Class Members' Private Information does not qualify for the party exemption.

207. Defendant's acquisition of patient communications that were used and disclosed to Google was done for purposes of committing criminal and tortious acts in violation of the laws of the United States and Georgia, including.

a.     Criminal violation of HIPAA, 42 U.S.C. § 1320d-6;

b.     Criminal violation of Georgia Code §16-11-62 Eavesdropping, Surveillance, or Intercepting Communication Which Invades Privacy of Another; Divulging Private Message;

c.     Criminal violation of Georgia Code §16-9-93(c) Forgery and Fraudulent Practices; Computer Systems Protections; Computer Crimes;

d.     Violation of the Georgia Uniform Deceptive Trade Practices Act, GA Code An. §§10-1-370; and

e.     Invasion of Privacy.

208. Under 42 U.S.C. § 1320d-6, it is a criminal violation for a person to "use[] or cause[] to be used a unique health identifier" or to "disclose[] individually

67

identifiable health information to another person … without authorization" from the patient.

209. The penalty for violation is enhanced where "the offense is committed with intent to sell, transfer, or use individually identifiable health information for commercial advantage, personal gain, or malicious harm." 42 U.S.C. § 1320d-6.

210. Defendant's conduct violated 42 U.S.C. § 1320d-6 in that it:

a.    Used and caused to be used cookie identifiers associated with specific patients without patient authorization; and

b.    Disclosed individually identifiable health information to Google without patient authorization as expressly required in its false and misleading privacy policies.

211. Defendant's conduct would be subject to the enhanced provisions of 42 U.S.C. § 1320d-6 because Defendant's use of Google source code was for Defendant's commercial advantage to increase revenue from existing patients and gain new patients.

212. Under O.C.G.A §16-11-62, it shall be unlawful for "Any person, through the use of any device, without the consent of all persons observed, to observe, photograph, or record the activities of another which occur in any private place and out of public view; provided, however, that it shall not be unlawful". A Device under this statute is defined as, "an instrument or apparatus used for

68

overhearing, recording, intercepting, or transmitting sounds or for observing, photographing, videotaping, recording, or transmitting visual images and which involves in its operation electricity, electronics, or infrared, laser, or similar beams. Without limiting the generality of the foregoing, the term "device" shall specifically include any camera, photographic equipment, video equipment, or other similar equipment or any electronic, mechanical, or other apparatus which can be used to intercept a wire, oral, or electronic communication."

213.   Defendant violated O.C.G.A §16-11-62 by exceeding its authorization to access Plaintiff's and Class Members' computers through use of a Device, namely, placement of the _ga, NID, and CID cookies as well as use of source code that commanded Plaintiffs' and Class Members' computing devices to make unauthorized copies of Plaintiff's and Class Members' electronic data and to send identifiers and the content of communications with Defendant simultaneously to Defendant, Google, and others.

214.   Under O.C.G.A §16-9-93(c), a person commits the offense of computer invasion of privacy when, "Any person who uses a computer or computer network with the intention of examining any employment, medical, salary, credit, or any other financial or personal data relating to any other person with knowledge that such examination is without authority shall be guilty of the crime of computer invasion of privacy."

69

215. Defendant violated O.C.G.A. §169-93(c) when it knowingly and without Plaintiff or Class Members' authorization inserted the _ga, NID, and CID cookies on Plaintiffs' and Class Members' computing devices.

216. The _ga, NID, and CID cookies, which constitute programs, commanded Plaintiffs' and Class Members' computing devices to remove and redirect their data and the content of their communications with Defendant to Google and others.

217. Defendant knew or had reason to know that the _ga, NID, and CID cookies would command Plaintiffs' and Class Members' computing devices to remove and redirect their data and the content of their communications with Defendant to Google and others.

218. Defendant is not exempt from ECPA liability under 18 U.S.C. § 2511(2)(d) on the ground that it was a participant in Plaintiffs' and Class Members' communications about their individually-identifiable patient health information on its Website, because it used its participation in these communications to improperly share Plaintiff's and Class Members' individually-identifiable patient health information with Google, third-parties that did not participate in these communications, that Plaintiff and Class Members did not know were receiving their individually-identifiable patient health information, and that Plaintiff and Class Members did not consent to receive this information.

219. Defendant accessed, obtained, and disclosed Plaintiff's and Class Members' Private Information for the purpose of committing the crimes and torts described herein because it would not have been able to obtain the information or the marketing services if it had complied with the law.

220. As such, Defendants cannot viably claim any exception to ECPA liability.

221. Plaintiff and Class Members have suffered damages as a direct and proximate result of Defendant's invasion of privacy in that:

a.    Learning that Defendant has intruded upon, intercepted, transmitted, shared, and used their individually-identifiable patient health information (including information about their medical symptoms, conditions, and concerns, medical appointments, healthcare providers and locations, medications and treatments, and health insurance and medical bills) for commercial purposes has caused Plaintiff and the Class Members to suffer emotional distress;

b.    Defendant received substantial financial benefits from its use of Plaintiff's and Class Members' individually-identifiable patient health information without providing any value or benefit to Plaintiff or the Class Members;

c.    Defendant received substantial, quantifiable value from its use of Plaintiff's and Class Members' individually-identifiable patient health information, such as understanding how people use its website and determining what ads people

71

see on its website, without providing any value or benefit to Plaintiffs or the Class Members;

d.     Defendant has failed to provide Plaintiff and the Class Members with the full value of the medical services for which they paid, which included a duty to maintain the confidentiality of their patient information; and

e.     The diminution in value of Plaintiffs' and Class Members' PII and PHI and the loss of privacy due to Defendant making sensitive and confidential information, such as patient status, test results, and appointments that Plaintiffs and Class Members intended to remain private no longer private.

222.   As a result of Defendant's violation of the ECPA, Plaintiff and Class Members entitled to all damages available under 18 U.S.C. § 2520, including statutory damages of whichever is the greater of $100 a day for each day of violation or $10,000, equitable or declaratory relief, compensatory and punitive damages, and attorney's fees and costs.

## COUNT III
**O.C.G.A §16-11-62**
**Eavesdropping, Surveillance, or Intercepting Communication Which Invades Privacy of Another; Divulging Private Message**
**(On Behalf of Plaintiff and the Class)**

223.   Plaintiff repeats the allegations contained in paragraphs 1-157 as if fully set forth herein and brings this Count individually and on behalf of the proposed Class.

72

224.   Plaintiff and Class Members have a statutory right to keep any private communications kept private and to not be divulged to an unauthorized person under Georgia law.

225.   Defendant intentionally and without Plaintiff's or Class Members' consent intercepted private communications between them and their healthcare providers then divulged that information to Google, and others through the cookies embedded within Defendant's website.

226.   Defendant's use of Plaintiff's and Class Members' names and Private Information did not serve any public interest.

227.   The unlawful tracking of Plaintiff and Class Members' and disclosure of their Private communications has caused Plaintiff and Class Members to suffer damages. This includes damage to the value of their information, which Defendant appropriated for its own enrichment. Plaintiff and Class Members have also suffered nominal damages.

228.   Defendant failed to protect Plaintiff's and Class Members' Private Information and acted intentionally when it installed the tracking tools onto its Website because the purpose of the tools is to track and disseminate individual's communications with the Website for the purpose of marketing and advertising.

229.   Because Defendant intentionally and secretly incorporated the Google tracking tools into its Website and encouraged patients to use that Website for

healthcare purposes, Defendant had notice and knew that its practices would cause injury to Plaintiff and Class Members.

230.   Plaintiff, on behalf of himself and Class Members, seeks compensatory damages for Defendant's invasion of privacy, which includes the value of the privacy interest invaded by Defendant, loss of time and opportunity costs, plus prejudgment interest, and costs. Alternatively, Plaintiff and Class Members are entitled to nominal damages.

231.   Plaintiff and Class Members are entitled to exemplary and/or punitive damages as a result of Defendant's knowing violations of their statutory rights to privacy.

232.   Defendant's wrongful conduct will continue to cause great and irreparable injury to Plaintiff and the Class since their Private Information is still maintained by Defendant and still in the possession of Google, and the wrongful disclosure of the information cannot be undone.

233.   Plaintiff and Class Members have no adequate remedy at law for the injuries relating to Defendant's continued possession of their sensitive and confidential records. A judgment for monetary damages will not undo Defendant's disclosure of the information to Google, who continues to possess and utilize that information.

234.   Plaintiff, on behalf of himself and Class Members, further seeks injunctive relief to enjoin Defendant from further intruding into Plaintiff's and Class Members' statutory privacy interests.

## COUNT IV
## BREACH OF IMPLIED CONTRACT
### (on behalf of Plaintiff and the Class)

235.   Plaintiff repeats the allegations contained in paragraphs 1-157 as if fully set forth herein and brings this Count individually and on behalf of the proposed Class.

236.   As a condition of utilizing Defendant's Website and receiving services from Defendant's healthcare facilities and professionals, Plaintiff and the Class Members provided their Private Information and compensation for their medical care.

237.   When Plaintiff and Class Members provided their Private Information to Defendant, they entered into an implied contract pursuant to which Defendant agreed to safeguard and not disclose their Private Information without consent.

238.   Plaintiff and Class Members would not have entrusted Defendant with their Private Information in the absence of an implied contract between them and Defendant obligating Defendant to not disclose Private Information without consent.

239. Plaintiff and Class Members would not have retained Defendant to provide healthcare services in the absence of an implied contract between them and Defendant obligating Defendant to not disclose Private Information without consent.

240. Defendant breached these implied contracts by disclosing Plaintiff's and Class Members' Private Information without consent to third parties like Google.

241. As a direct and proximate result of Defendant's breaches of these implied contracts, Plaintiff and Class Members sustained damages as alleged herein, including but not limited to the loss of the benefit of their bargain and diminution in value of Private Information.

242. Plaintiff and Class Members are entitled to compensatory and consequential damages as a result of Defendant's breach of implied contract.

## COUNT V
### UNJUST ENRICHMENT
### (On behalf of Plaintiff and the Class)

243. Plaintiff repeats the allegations contained in paragraphs 1-157 as if fully set forth herein and brings this Count individually and on behalf of the proposed Class.

244. Defendant benefits from the use of Plaintiff's and Class Members' Private Information and unjustly retained those benefits at their expense.

245.    Plaintiff and Class Members conferred a benefit upon Defendant in the form of Private Information that Defendant collected from Plaintiff and Class Members, without authorization as required in its privacy policies and proper compensation to exceed the limited authorization and access to that information which was given to Defendant.

246.    Defendant exceeded any authorization given and instead consciously disclosed and used this information for its own gain, providing Defendant with economic, intangible, and other benefits, including substantial monetary compensation.

247.    Defendant unjustly retained those benefits at the expense of Plaintiff and Class Members because Defendant's conduct damaged Plaintiff and Class Members, all without providing any commensurate compensation to Plaintiff and Class Members.

248.    The benefits that Defendant derived from Plaintiff and Class Members was not offered by Plaintiff and Class Members gratuitously and rightly belongs to Plaintiff and Class Members. It would be against equity and good conscience for Defendant to be permitted to retain any of the profit or other benefits wrongly derived from the unfair and unconscionable methods, acts, and trade practices alleged in this Complaint.

249.   Defendant should be compelled to disgorge into a common fund for the benefit of Plaintiff and Class Members all unlawful or inequitable proceeds that Defendant received, and such other relief as the Court may deem just and proper.

### COUNT VI
### NEGLIGENCE
**(On behalf of Plaintiff and the Class)**

250.   Plaintiff repeats the allegations contained in paragraphs 1-157 as if fully set forth herein and brings this Count individually and on behalf of the proposed Class.

251.   Defendant owed Plaintiff and Class Members a duty to keep their Private Information completely confidential, and to safeguard sensitive personal and medical information.

252.   Plaintiff and Class Members had reasonable expectations of privacy in their communications exchanged with Defendant, including communications exchanged on Defendant's Website.

253.   Contrary to its duties as a medical provider and its express promises of confidentiality, Defendant installed its Tracking Tools to disclose and transmit to third parties Plaintiff's and Class Members' communications with Defendant, including Private Information and the contents of such information.

254.   These disclosures were made without Plaintiff's or Class Members' knowledge, consent, or authorization, and were unprivileged.

255. The third-party recipients included, but may not be limited to, Google and its subsidiaries.

256. As a direct and proximate cause of Defendant's unauthorized disclosures of patient personally identifiable, non-public medical information, and communications, Plaintiff and Class members were damaged by Defendant's breach in that:

a. Sensitive and confidential information that Plaintiff and Class members intended to remain private is no longer private;

b. Plaintiff and Class members face ongoing harassment and embarrassment in the form of unwanted targeted advertisements;

c. Defendant eroded the essential confidential nature of the provider-patient relationship;

d. General damages for invasion of their rights in an amount to be determined by a jury;

e. Nominal damages for each independent violation;

f. Defendant took something of value from Plaintiff and Class Members and derived benefit therefrom without Plaintiff's and Class Members' knowledge or informed consent and without compensation for such data;

g. Plaintiff and Class Members did not get the full value of the medical services for which they paid, which included Defendant's duty to maintain confidentiality;

h. Defendant's actions diminished the value of Plaintiff's and Class Members' Private Information; and

i. Defendant's actions violated the property rights Plaintiff and Class Members have in their Private Information.

79

257.    Plaintiff and Class Members are entitled to recover actual damages, to recover the costs of this action (including reasonable attorneys' fees), and such other relief as the Court deems just and proper.

**COUNT VII**
**VIOLATIONS OF THE GEORGIA UNFAIR AND DECEPTIVE TRADE PRACTICES ACT §10-1-372**
**(On behalf of Plaintiff and the Class)**

258.    Plaintiff repeats the allegations contained in paragraphs 1-157 as if fully set forth herein and brings this Count individually and on behalf of the proposed Class.

259.    This cause of action is brought pursuant to the Georgia UDTPA which Georgia courts have invariably interpreted using the kind of liberal construction afforded to state consumer protection statutes intended to prevent fraud.

260.    Georgia UDTPA §10-1-372 prohibits deceptive acts or practices in the conduct of any business, trade, or commerce, or in the furnishing of any service in the state of Georgia.

261.    By reason of the conduct alleged herein, Defendant engaged in unlawful practices within the meaning of Georgia UDTPA §10-1-372. The conduct alleged herein is a "business practice" within the meaning of Georgia UDTPA §10-1-372, and the deception occurred within Georgia State.

262. By serving as Plaintiff's and Class Members' healthcare provider, Defendant had a duty to protect their Private Information from unlawful disclosure.

263. Plaintiff and the Class Members paid for or otherwise availed themselves and received services from Defendant, for the purpose of medical treatment.

264. Defendant engaged in the conduct alleged in this Class Action Complaint, entering into transactions intended to result, and which did result, in the provision of medical treatment to Plaintiff and Class Members.

265. Defendant's acts, practices, and omissions were done in the course of Defendant's offer of medical treatment, services, and care throughout the state of Georgia and the United States.

266. The unfair, unconscionable, and unlawful acts and practices of Defendant alleged herein, and in particular the decisions regarding Google's tracking tools, emanated and arose within the state of Georgia, within the scope of Georgia UDTPA §10-1-372.

267. Defendant, operating in and out of Georgia, engaged in unfair, unconscionable, and unlawful trade acts or practices in the conduct of trade or commerce, in violation of UDTPA §10-1-372, including but not limited to the following: (a) knowingly promising to protect Plaintiff's and Class Members' Private Information in its privacy policies, (b) knowingly and improperly storing,

81

possessing, using, and/or procuring the interception of, Plaintiff's and Class Members' Private Information; and (c) knowingly disclosing Plaintiff's and Class Members' Private Information to Google.

268.   Defendant committed these acts while concurrently representing that it would protect and not unlawfully disclose Plaintiff's and Class Members' Private Information unless under a legal obligation to do so.

269.   These unfair, unconscionable, and unlawful acts and practices violated duties imposed by laws, including by not limited to HIPAA, Georgia computer crime statutes, and Georgia UDTPA §10-1-372.

270.   Defendant knew or should have known that its Website and the cookies and source code thereon was unlawfully wiretapping, intercepting, and disclosing Plaintiff's and Class Members' Private Information.

271.   Plaintiff has standing to pursue this claim because as a direct and proximate result of Defendant's violations of Georgia UDTPA §10-1-372, Plaintiff and Class Members have been "aggrieved" by a violation of Georgia UDTPA §10-1-372 and bring this action to obtain a declaratory judgment that Defendant's acts or practices violate Georgia UDTPA §10-1-372.

272.   Plaintiff also has standing to pursue this claim because, as a direct result of Defendant's knowing violation of Georgia UDTPA §10-1-372, Plaintiff and Class Members have lost money or property in the form monies paid for Defendant's

services, diminution in value of their Private Information, as well as loss of the benefit of their bargain with Defendant.

273. Plaintiff and Class Members are entitled to injunctive relief to protect them from the substantial and imminent risk of future loss of Private Information, including, but not limited to: (a) ordering that Defendant immediately remove any pixel, web beacon, cookie, or other tracking technology that causes the disclosure of Private Information to third parties without consent; (b) ordering that Defendant engage third-party security auditors and internal personnel to ensure Plaintiff's and Class Members' Private Information is no longer subject to the unlawful practices described in this Complaint; (c) ordering that Defendant purge, delete, and destroy Private Information not necessary for its provisions of services in a reasonably secure manner; (d) ordering that Defendant conduct regular database scans and security checks; (e) ordering that Defendant routinely and continually conduct internal training and education to inform internal security personnel how to properly handle Private Information provided via Defendant's Website; (f) ordering Defendant to meaningfully educate individuals about the threats they face as a result of the loss of their Private Information to third parties, as well as the steps victims should take to protect themselves.

274. Plaintiff brings this action on behalf of himself and Class Members for the relief requested above and for the public benefit in order to promote the public

interests in the provision of truthful, fair information to allow consumers to make informed purchasing decisions and to protect Plaintiff, Class Members, and the public from Defendant's unfair methods of competition and unfair, unconscionable, and unlawful practices. Defendant's wrongful conduct as alleged in this Class Action Complaint has had widespread impact on the public at large.

275. The above unfair, unconscionable, and unlawful practices and acts by Defendant were immoral, unethical, oppressive, and unscrupulous. These acts caused substantial injury to Plaintiff and Class Members that they could not reasonably avoid; this substantial injury outweighed any benefits to consumers or to competition.

276. Defendant's actions and inactions in engaging in the unfair, unconscionable, and unlawful practices described herein were negligent, knowing and willful, and/or wanton and reckless.

277. Plaintiff and Class Members seek relief under Georgia UDTPA §10-1-372, including, but not limited to, a declaratory judgment that Defendant's actions and/or practices violate Georgia UDTPA §10-1-372; injunctive relief enjoining Defendant, their employees, parents, subsidiaries, affiliates, executives, and agents from continuing to violate Georgia UDTPA §10-1-372 as described above.

278.    Plaintiff and Class Members are also entitled to recover actual damages, to recover the costs of this action (including reasonable attorneys' fees), and such other relief as the Court deems just and proper.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff, on behalf of himself and Class Members, requests judgment against Defendant and that the Court grant the following:

A.    For an Order certifying the Class and appointing Plaintiff and Counsel to represent such Class;

B.    For equitable relief enjoining Defendant from engaging in the wrongful conduct alleged in this Complaint pertaining to the misuse and/or disclosure of the Private Information of Plaintiff and Class Members;

C.    For injunctive relief requested by Plaintiff, including, but not limited to, injunctive and other equitable relief as is necessary to protect the interests of Plaintiff and Class Members:

D.    For an award of damages, including, but not limited to, actual, consequential, statutory, punitive, and nominal damages, as allowed by law in an amount to be determined;

E.    For an award of attorneys' fees, costs, and litigation expenses, as allowed by law;

F.    For prejudgment interest on all amounts awarded; and

G.     Such other and further relief as this Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands that this matter be tried before a jury.

Dated: June 12, 2026

                                        Respectfully submitted,

                                        **MILBERG PLLC**

                                        */s/ Casondra Turner*
                                        Casondra Turner, Esq. (GA Bar No. 418426)
                                        260 Peachtree Street NW, Suite 2200
                                        Atlanta, GA 30303
                                        Tel: (771) 772-3086
                                        E: cturner@milberg.com

                                        Leanna Loginov, *pro hac vice forthcoming*
                                        **SHAMIS & GENTILE, P.A.**
                                        14 NE 1st Avenue, Suite 705
                                        Miami, FL 33132
                                        Tel: (305) 479-2299
                                        E: lloginov@shamisgentile.com

                                        Joseph M. Lyon, *pro hac vice forthcoming*
                                        **The Lyon Firm**
                                        2754 Erie Ave.
                                        Cincinnati, Ohio 45208
                                        Phone: (513) 381-2333
                                        Fax: (513) 766-9011
                                        *jlyon@thelyonfirm.com*